**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 25-00299 (AHA) |
| RAYVON APPLEWHITE, | |
| *Defendant*. | |

**<u>Memorandum Opinion and Order</u>**

Rayvon Applewhite moves to suppress a gun the government seized from him after officers stopped him on the street, arguing the stop violated the Fourth Amendment. After considering the evidence, including live testimony at the suppression hearing, the court concludes the government has shown the officers had reasonable suspicion for the stop and denies the motion to suppress.

## I.    Background[1]

On an afternoon in July 2025, Applewhite was walking with his fiancé in a residential and commercial area of Northeast D.C. ECF No. 19 at 17, 65, 96–97, 104. Applewhite wore a letterman jacket wrapped around his waist, with the sleeves tied at the front. *Id.* at 81, 102; Gov't Ex. 101-2 at 15:34:18–15:34:20.

Metropolitan Police Department Officers Ryan Brooksbank and Aleksander De'Plour were on duty together in the same area. ECF No. 19 at 14–16. Officer Brooksbank saw Applewhite do a "security check" as he walked, moving his hand to his waistband to confirm that something was secured there. *Id.* at 26–27, 85–86. Officer Brooksbank reported the security check over the radio,

---

[1]    The facts described reflect the court's findings based on the testimony and evidence presented at the court's suppression hearing and with accompanying briefing.

noting also that Applewhite changed his trajectory after he saw the officers. Gov't Ex. 301 at 00:18–00:37; *see also* ECF No. 19 at 26–28.

The officers drove toward Applewhite, pulled up alongside him, and got out of their car. Gov't Ex. 101-2 at 15:34:10–15:34:18; Gov't Ex. 102 at 15:34:10–15:34:18. Officer Brooksbank asked Applewhite, "What's up boss?" Gov't Ex. 101-2 at 15:34:15–15:34:19. Officer Brooksbank then asked, "Hey. Real quick. I just saw something over here. You, you happen to have anything on you that you're not supposed to, man?" *Id.* at 15:34:18–15:34:23. Applewhite responded, "Just my phone" and pulled out his cell phone from his right side pocket. *Id.* at 15:34:22–15:34:25. Officer Brooksbank then asked, "You, you don't happen to have any weapons on you, by any chance, do you?" *Id.* at 15:34:24–15:34:28. Applewhite responded "No, sir." *Id.* at 15:34:26–15:34:28.

Officer De'Plour, who walked alongside Applewhite looking directly at his waist area, saw a clip attached to Applewhite's front waistband, underneath the letterman jacket, that looked like part of an inside-the-waistband gun holster. ECF No. 19 at 40, 44–48. Officer De'Plour then cut in front of Applewhite, held Applewhite's arm, and told him to "stop." Gov't Ex. 101-2 at 15:34:26–15:34:32.

The officers then grabbed Applewhite's arms to search his waist. *Id.* at 15:34:30–15:34:50. Applewhite told the officers he did not consent to a search, and Officer De'Plour found a gun inside a holster where he had seen the clip. ECF No. 19 at 39–40, 48–49; Gov't Ex. 101-2 at 15:34:32–15:34:43; *see* Gov't Exs. 204, 207.

The government charged Applewhite with unlawful possession of a firearm under 18 U.S.C. § 922(g)(1), and Applewhite moves to suppress the gun under the Fourth Amendment. ECF

No. 14. After the parties briefed the issues, the court held a suppression hearing, at which Officer De'Plour and Applewhite's fiancé testified.

## II.    Discussion

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "Searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up). "If the government oversteps that constitutional boundary, the remedy is generally exclusion—courts must suppress the unlawfully obtained evidence and any derivative evidence tainted by the violation unless an exception applies." *United States v. Green*, 149 F.4th 733, 743 (D.C. Cir. 2025).

The parties disagree about, first, when Applewhite was seized within the meaning of the Fourth Amendment and, second, whether the government had reasonable suspicion to justify the seizure and protective search. The court addresses each issue in turn.

### A.  The Officers Seized Applewhite When Officer De'Plour Said "Stop"

"For purposes of the Fourth Amendment a seizure occurs when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "Whether police action amounts to a show of authority requires the court to ask whether a reasonable person in view of all the circumstances surrounding the incident would have believed that he was not free to leave." *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016) (cleaned up). "Factors considered in assessing whether an officer's actions amounted to a show of authority include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the

encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *Id.* at 632–33 (cleaned up). "The person challenging the seizure 'bears the burden of demonstrating that he was seized.'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (quoting *Castle*, 825 F.3d at 633).

Applewhite argues the officers seized him when they "circled around" him to ask questions and get a look at his waist area while he was walking with his fiancé. ECF No. 14 at 4. The government says the officers seized Applewhite when Officer De'Plour cut in front of him and he stopped in response to the officer's order. ECF No. 15 at 9. The government is right under binding caselaw.

The officers did not seize Applewhite when they pulled up to him and walked alongside him asking questions. *See* Gov't Ex. 101-2 at 15:34:15–15:34:28. "Police do not manifest a show of authority merely by approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, or by putting some questions to him if the person is willing to listen, provided the officers do not imply that answers are obligatory." *Castle*, 825 F.3d at 633 (cleaned up). The questioning here, which involved asking Applewhite whether he had any weapons on him, was of a nature that courts consistently hold falls short of a seizure. *See United States v. Gross*, 784 F.3d 784, 785, 788 (D.C. Cir. 2015) (holding there was no seizure where officers called out to the defendant from a police car, "Hey, it is the police, how are you doing? Do you have a gun? . . . Can I see your waistband?" and, in response, the defendant lifted his jacket to show his left side (cleaned up)); *United States v. Bryant*, 111 F.4th 105, 110 (D.C. Cir. 2024) (holding that the officer's question, "you ain't got no guns on you, do ya?" did not transform police encounter into a seizure). Nor does the evidence support that Applewhite's movement was sufficiently restricted at that point such that a seizure occurred. While one of the officers walked

4

next to Applewhite on the sidewalk and the other officer walked slightly in front of them in the street, Applewhite's pathway was not blocked, and he remained free to leave. *See* Gov't Ex. 101-2 at 15:34:16–15:34:28; *see United States v. Lloyd*, 868 F.2d 447, 451 (D.C. Cir. 1989) (concluding that no seizure occurred where one officer approached the defendant and "politely asked him a series of questions" while another officer "remained several feet away").

There is and could be no dispute, however, that the officers seized Applewhite when Officer De'Plour cut in front of Applewhite, held Applewhite's arm, and said "stop" multiple times. *See* Gov't Ex. 101-2 at 15:34:28–15:34:34. At that point, a reasonable person "would have believed that he was not free to leave." *Castle*, 825 F.3d at 632 (citation omitted); *see id.* at 633 (holding that appellant was seized when the officer "touched Appellant and instructed him to 'hold on' and Appellant complied"). Applewhite cites *United States v. Wood*, 981 F.2d 536 (D.C. Cir. 1992), to argue that the officers' "positioning" while giving an order can result in a seizure. *Id.* at 540; *see* ECF No. 14 at 5. That is undoubtedly true, but here the officers did nothing to seize Applewhite until Officer De'Plour cut in front of him and simultaneously held his arm and said to stop. Indeed, in *Wood* itself, the court found the requisite show of authority because the officer not only stood behind the defendant, but also ordered him to "halt right there" and "stop," similar to Officer De'Plour's commands in this case. *Wood*, 981 F.2d at 540.

## B. The Officers Had Reasonable, Articulable Suspicion to Seize and Search Applewhite

"[A]n officer may briefly detain a citizen if he has a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Incident to such a stop, the police may conduct a protective search for weapons if they possess an articulable suspicion that an individual is armed and dangerous." *United States v. Dykes*, 406 F.3d 717, 719 (D.C. Cir. 2005) (cleaned up); *see also*

*Terry*, 392 U.S. at 27 (holding that an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime"). "The government bears the 'burden to provide evidence sufficient to support reasonable suspicion.'" *Delaney*, 955 F.3d at 1081 (quoting *Castle*, 825 F.3d at 634). The court looks to the totality of the circumstances, considering only "the facts available to the officer at the moment of the seizure." *Castle*, 825 F.3d at 635 (quoting *Terry*, 392 U.S. at 21–22). The inquiry is an objective one: "'whether a reasonably prudent man in the circumstances would be warranted in his belief' that the suspect is breaking, or is about to break, the law." *Id.* (quoting *Edmonds*, 240 F.3d at 59).[2]

Here, the court concludes based on the totality of the testimony and other record evidence that the officers had a reasonable, articulable suspicion that Applewhite was unlawfully carrying a firearm. First, Applewhite stipulated he was walking in a high crime area. ECF No. 19 at 7–9. Although this "will not *by itself* justify a *Terry* stop," the D.C. Circuit has said "it is among the various factors that officers may take into account." *Edmonds*, 240 F.3d at 60; *see also Castle*, 825 F.3d at 636 (recognizing that "the high crime nature of the neighborhood" is a "contextual consideration" that, while insufficient on its own, is "not unimportant").

Second, Officer Brooksbank saw Applewhite conducting a "security check," indicating he was confirming a weapon was secured near his waist. *See* ECF No. 19 at 26–27 (Officer De'Plour testifying that Officer Brooksbank told him that he "saw the defendant, who was at Montana and

---

[2]    The parties do not separate their arguments regarding the officers' reasonable articulable suspicion for the stop and reasonable articulable suspicion for the subsequent protective search. *See* ECF No. 14 at 5–10; ECF No. 15 at 12–15. Rather, they merge their analysis as to whether there was reasonable articulable suspicion to believe criminal activity was afoot and to believe Applewhite was armed and dangerous given that both inquiries concern whether the officers had reasonable suspicion to believe Applewhite was unlawfully carrying a gun. The court accordingly does the same.

Rhode Island, make a pushing-down motion behind the sleeves as if something was placed at the waistband area"); *id.* at 85–86. This is confirmed by Officer Brooksbank's contemporaneous radio report. Gov't Ex. 301 at 00:18–00:37 (Officer Brooksbank stating over the radio, "we have one guy walking down the street right now, black t-shirt, white hoodie wrapped around his waistband. Kind of did a little security check, looked down, and now he's walking down Rhode Island instead").

Third, and most significantly, the officers had reason to believe Applewhite was not only carrying a gun but was doing so unlawfully because he lied to them about it. Before stopping Applewhite, the officers told him they "just saw something" and asked him, "you happen to have anything on you that you're not supposed to, man?" and "you don't happen to have any weapons on you, by any chance, do you?" Gov't Ex. 101-2 at 15:34:18–15:34:28. Applewhite identified only his cell phone and said, "No, sir." *Id.* at 15:34:23–15:34:28. After Applewhite denied having any weapons, Officer De'Plour saw what appeared to be a gun holster underneath Applewhite's letterman jacket. ECF No. 19 at 40, 44–48. Officer De'Plour's testimony is consistent with body-worn camera footage, which shows him carefully scanning Applewhite's waist and stopping him only after seeing the holster clip, which was visible on Applewhite's pants. Gov't Ex. 101-2 at 15:34:25–15:34:30; *see, e.g.*, Gov't Exs. 201-2, 203-1.[3]

To be sure, the court does not find all of the government's bases for reasonable suspicion persuasive. Officer De'Plour testified candidly at the suppression hearing that it is department policy to stop and search anyone who is believed to be carrying a weapon—that's so even if there

---

[3] The court finds Officer De'Plour's testimony credible. While Applewhite attempted to impeach Officer De'Plour's credibility by asking him about two open investigations, Applewhite did not tie the investigations to any particular credibility issue in this case. *See* ECF No. 19 at 53–58.

is no reason to believe they are carrying it unlawfully and even if the person has disclosed that they are carrying with a license (in which case the officers will conduct the search and return the gun after the license is confirmed). ECF No. 19 at 86–89. The court is dubious that a stop and search of this nature, without more, could withstand Fourth Amendment scrutiny, which requires reasonable suspicion that criminal activity may be afoot. *See Edmonds*, 240 F.3d at 59 (explaining that "an officer may briefly detain a citizen if he has a reasonable, articulable suspicion that 'criminal activity may be afoot'" (quoting *Terry*, 392 U.S. at 30)). But here, the officers had more. They did not only have reason to believe Applewhite was carrying a gun based on the security check in a high crime neighborhood. They also had reason to believe he was carrying a gun unlawfully because Applewhite had lied about carrying a gun just seconds before Officer De'Plour saw the holster clip. *See United States v. Carrasquillo*, 877 F.2d 73, 77 (D.C. Cir. 1989) (concluding that fact that the defendant "either was carrying no luggage or falsely denied that the bag under his seat was his" supported the officers' reasonable suspicion); *United States v. Adebanjo*, 54 F.3d 774, at *5 (4th Cir. 1995) (unpublished table decision) ("Making misrepresentations to law enforcement officers is yet another factor tending to establish reasonable, articulable suspicion."); *United States v. Atchley*, 474 F.3d 840, 848–49 (6th Cir. 2007) (same); *see also United States v. Taylor*, 743 F. Supp. 3d 168, 179–80 (D.D.C. 2024) (explaining that the defendant's failure to comply with "the affirmative requirements for concealed carry licensees" under D.C. law, including his failure to disclose certain "information to the officers when they stopped him, particularly given that they had, moments before, asked him whether he

had a gun, provided the officers with reason to believe that [the defendant] was carrying the gun unlawfully").[4]

As the government acknowledged, each factor in isolation falls short of establishing reasonable suspicion. ECF No. 19 at 129. But considering the totality of the circumstances—including the high crime area, Officer Brooksbank's observance of Applewhite conducting a security check, and Officer De'Plour's observance of a clip in Applewhite's front waistband—the court concludes that the officers had a reasonable, articulable suspicion to justify the seizure and search.[5]

---

[4]    The court attributes little or no weight to certain other facts highlighted by the government and the officers. For instance, while some courts have attributed significance to clothing that appears out of place, the court does not find that Applewhite wearing a jacket around his waist on a warm day meaningfully contributed to the officers' reasonable suspicion that he was unlawfully carrying a gun. *See United States v. Zanders*, 547 F. Supp. 190, 192 (D.D.C. 1982) (holding the defendant "wearing a winter overcoat on a hot August night" could provide reasonable suspicion that the overcoat concealed a weapon). The court also does not attribute significance to testimony that it appeared that Applewhite and his fiancé "were going to walk" one way and then "changed direction." ECF No. 19 at 27. It is not clear they changed direction in response to police and, in any event, while "unprovoked flight upon noticing the police" supports reasonable suspicion, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), the D.C. Circuit has acknowledged that "[m]erely walking away, even quickly . . . , upon the arrival of [a] uniformed police officer would not provide articulable suspicion of criminal wrongdoing," *United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009). The court also does not rely on Officer Brooksbank's later statement that he saw a bulge on the right side of Applewhite's pants, particularly given Officer De'Plour's testimony that he did not see any bulge and the government's decision not to rely on that statement. ECF No. 19 at 45; ECF No. 15 at 12 n.1.

[5]    Applewhite also asserts in a single sentence in his motion that "law enforcement did more than a mere 'frisk' pat down but rather a more invasive exploratory search." ECF No. 14 at 8. However, the body worn camera footage shows that Officer De'Plour engaged in a brief protective pat down of Applewhite's outer clothing, focused on the area of his waist where he suspected a gun was concealed. *See* Gov't Ex. 101-2 at 15:34:34–15:34:44. This pat down was plainly "of the sort permitted by *Terry*." *Dickerson*, 508 U.S. at 373; *see Terry*, 392 U.S. at 30–31 (holding that "a carefully limited search of the outer clothing . . . in an attempt to discover weapons" is "a reasonable search under the Fourth Amendment").

9

## III.    Conclusion

For these reasons, the court denies Applewhite's motion to suppress evidence, ECF No. 14.

 

_____

AMIR H. ALI
United States District Judge

Date:    April 21, 2026